# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **DAVID A. URBAN,** | ) | |
| | ) | |
| Plaintiff and | ) | |
| Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | Case No. 03 C 6630 |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | Magistrate Judge |
| | ) | Martin C. Ashman |
| Defendant, Counterclaimant, | ) | |
| and Third-Party Plaintiff, | ) | |
| | ) | |
| | ) | |
| | ) | |
| **SAMY HAMMAD,** | ) | |
| | ) | |
| Additional Counterclaim | ) | |
| Defendant and Third-Party | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff, David A. Urban, moves this Court to find that, per 26 U.S.C.A. § 7430, he is the "prevailing party" in his suit against Defendant and Counterclaimant, the United States of America. The United States opposes Plaintiff's motion. The parties have consented to have this Court conduct any and all proceedings in this case, including the entry of final judgment. *See* 28 U.S.C.A. § 636(c); Local R. 73.1(a). For the reasons that follow, Plaintiff's motion is granted.

# I.  Background

## A.  All American Corporation

All American Corporation ("AAC") was a commercial painting company formed in 1985 by Samy Hammad, Leonard Damond, John Depa, Robert Schenk, and Plaintiff. All five members were equal shareholders in AAC. Early on in the venture, Schenk was bought out by the other partners and Jeff Gardner bought ten percent of AAC. Thus, by 1991, Hammad, Damond, Depa, and Plaintiff were each 22.5% shareholders in AAC, and Gardner was a 10% shareholder. From 1985 until 1995, Plaintiff worked as AAC's chief estimator and was responsible for pricing paint jobs and assisting with AAC's day-to-day operations. Plaintiff also served as an officer of the corporation until 1990, and served on AAC's Board of Directors until he left the company in November 1995.

While Plaintiff was experienced in painting, Hammad had the financial and business knowledge and connections necessary to get AAC off the ground and it was Hammad who ran AAC. At AAC, Hammad was in charge of financial and accounting operations and set AAC's financial policies. For instance, Hammad orchestrated the financing of the company, kept tight control over which of AAC's bills were paid and when, and filed AAC's tax returns and financial statements. Hammad, along with Damond, was listed as a director and officer of AAC with the Illinois Secretary of State. Finally, in April 1994, Hammad became the majority shareholder of AAC when he bought 18.5% of AAC from Damond[1] and 10% of AAC from Depa.

---

[1] At trial, Damond suggested that he did not sell his shares of AAC but rather ceded all of his voting rights to Hammad in order to make it easier and faster for Hammad to control decision making at AAC.

By 1993, AAC was in serious financial trouble. It was at this time that the United States' Internal Revenue Service ("IRS") approached Hammad about AAC's failure to pay withheld employment taxes. The IRS offered AAC additional time to pay the back taxes if each AAC shareholder waived the relevant two-year statute of limitations by signing an IRS Form 2750 "Waiver Extending Statutory Period for Assessment of 100 Percent Penalty" ("Form 2750 waiver"). The IRS claims that it received signed Form 2750 waivers from all five AAC shareholders in June 1993 and therefore chose not to assess AAC for unpaid taxes at that time. The events surrounding the signing of the waivers in 1993 and the authenticity of the waivers in the IRS's possession were contested since the beginning of this case.

In 1995, AAC ceased to exist. In 1998, the IRS began investigating AAC's failure to pay certain employment taxes. At that time, the IRS had original copies of Form 2750 waivers signed by Hammad, Damond, Depa, and Gardner,[2] but no waiver from Plaintiff. Investigators contacted Hammad regarding AAC's tax liabilities and, on February 18, 1999, Hammad faxed the IRS Part 2 (the "Copy for Person Potentially Responsible") of a Form 2750 waiver purportedly signed by Plaintiff.[3] The faxed copy contained a signature that bore a strong resemblance to Plaintiff's signature. While the IRS never found an original Form 2750 waiver

---

[2] Gardner, like Plaintiff, denied signing or submitting the Form 2750 waiver.

[3] IRS Form 2750 is a multi-part form consisting of four pages. The top page bears the notation "Part 1 - IRS Copy" and is the page that bears the taxpayer's original signature. The second page bears the notation "Part 2 - Copy for Person Potentially Responsible." The third and fourth pages are instructions. The IRS Form 2750 is constructed so that when the top page is signed a carbon copy of the signature is transferred to the second page. Upon receipt of an IRS Form 2750, it is ordinary IRS practice to retain Part 1 and mail Part 2 of the waiver back to the taxpayer.

signed by Plaintiff in its possession, on the eve of trial, the IRS did find entry records in their SPIRIT computer system suggesting that five waivers were received from AAC in 1993.

In March 2000 and March 2002, the IRS found Plaintiff to be a willful and responsible officer of AAC and imposed a trust fund recovery penalty against him, pursuant to 26 U.S.C.A. § 6672, for the quarterly tax periods ending September 30, 1991, December 31, 1991, March 31, 1992, December 31, 1992, June 30, 1995, and September 30, 1995. Plaintiff paid $6,241 to the IRS and then, on September 18, 2003, filed a complaint against the United States seeking a refund of amounts paid to the IRS toward the trust fund recovery penalty. Among other things, Plaintiff's complaint alleged that: (1) he was not a person required to collect, truthfully account for, and pay over the withheld employment taxes of the employees of AAC for the relevant quarters; (2) he did not willfully fail to collect such taxes or truthfully account for and pay over such taxes; and (3) he never signed the Form 2750 waiver, upon which the IRS relied in assessing him penalties with respect to four calendar quarters in 1991 and 1992. (Pl.'s Compl. at 3, 5.) On April 15, 2004, the United States filed an amended answer and counterclaim against Plaintiff, alleging that Plaintiff owes the United States in excess of one million dollars for a trust fund penalty pertaining to unpaid payroll taxes owed by AAC.

### B.    Trial

#### 1.    Plaintiff's Case

This case went to trial by a jury on September 13, 2005. At trial, Plaintiff argued that: (1) he never signed the Form 2750 waiver, upon which the IRS relied in assessing him penalties with respect to four calendar quarters in 1991 and 1992; (2) he was not a person required to collect,

truthfully account for, and pay over the withheld employment taxes of the employees of AAC for the relevant quarters; and (3) he did not willfully fail to collect such taxes or truthfully account for and pay over such taxes. Plaintiff testified that he never signed the Form 2750 waiver, never attended a meeting where the Form 2750 waivers were discussed, and learned about the Form 2750 waiver for the first time in 1999, when the IRS contacted him. (Tr. at 90-93.) Plaintiff also denied having control over AAC and claimed to have no knowledge of AAC's tax problems prior to 1999. According to Plaintiff, Hammad was in complete control of AAC finances at all times. Plaintiff also explained that, since the creation of AAC until today, he and Hammad have had a terrible relationship, fought constantly in the workplace and have filed various lawsuits against each other. Plaintiff suggested that Hammad was assisting the IRS in this case in order to reduce the tax assessment against Hammad and to hurt Plaintiff. The Court finds Plaintiff's demeanor and testimony at trial to be credible and consistent.

In support of his testimony, Plaintiff presented physical and testimonial evidence. Plaintiff presented an expert witness to challenge the authenticity of the signature on the copy of the Form 2750 waiver, State of Illinois documents listing Hammad as the officer and director of AAC, and AAC documents suggesting that Hammad controlled AAC and Plaintiff was an AAC officer in name only. (Pl.'s Trial Exs. 6-7, 9, 11-13.) Plaintiff also called Gardner to the stand. Gardner claimed that he, like Plaintiff, (1) never attended an AAC meeting where Hammad discussed Form 2750 waivers, (2) did not sign a Form 2750 waiver in 1993, and (3) never heard about the Form 2750 waivers prior to 1999. Gardner not only supported Plaintiff's testimony but also alleged that his Form 2750 waiver had been forged and submitted to the IRS without his

- 5 -

knowledge. Gardner appeared composed and genuine on the witness stand and the Court finds his testimony credible and convincing.

Gardner's strong testimony on behalf of Plaintiff went largely uncontested. The United States attempted to impeach Gardner's credibility by presenting an original waiver purportedly signed by Gardner, but the United States never authenticated the signature on that document. The United States also called witnesses who claimed that Plaintiff and Gardner were on good terms when they worked together at AAC but those witnesses did not reveal any real bias on the part of Gardner. (Tr. at 618.)

### 2. United States' Case

#### a. **Waiver**

At trial, the United States argued that physical and testimonial evidence proved that Plaintiff signed and submitted a Form 2750 waiver. The United States focused on the physical characteristics of the faxed copy of the Form 2750 waiver that it received from Hammad and attempted to prove that: (1) Plaintiff's signature matched the signature on the faxed copy of the waiver, and (2) the serial number on the faxed copy of the waiver corresponded with the serial numbers on the other AAC waivers, proving that all five waivers were received in 1993. Next, the United States relied on witness testimony to show that Plaintiff received and signed the waiver.

The United States' physical evidence was less than weak and did not rebut Plaintiff's arguments. The signature on the faxed copy of the waiver bore strong similarities to Plaintiff's signature, as noted by every witness familiar with Plaintiff's signature. However, Plaintiff did

- 6 -

not deny that the signature on the faxed copy of the Form 2750 waiver looked like his signature. Rather, Plaintiff testified that he never signed the waiver and implied that his signature had been forged by Hammad, an allegation Hammad never denied at trial. The United States submitted its copy of the waiver to a FBI handwriting expert for examination. The handwriting expert prepared a pretrial report and testified at the trial. Neither the expert's pretrial report nor trial testimony concluded that Plaintiff signed the waiver. Similarly, the serial number on the faxed copy of the waiver did not prove that Plaintiff signed the waiver nor that he submitted it in 1993. While retired IRS agent Rodney Joseph testified that the serial numbers on the five AAC waivers suggested that all five were received at about the same time in 1993, he conceded that errors could have been made when the data was entered into the SPIRIT system in 1999.[4] (Tr. at 229.) More importantly, however, the serial numbers did not address Plaintiff's claim that his waiver had been forged and submitted to the IRS without his knowledge.

The United States attempted to prove that Plaintiff signed the Form 2750 waiver with witness testimony. The United States called Damond to testify against Plaintiff and to discredit Gardner.[5] Damond testified that Plaintiff and Gardner knew about the waivers and AAC's tax problems because (1) in 1993, all five shareholders met and discussed the need to sign Form

---

[4] Significantly, data entry errors regarding the dates of Gardner's waiver came to light during the trial. Furthermore, irregularities on the face of the AAC waivers and in the filing process further weakened the credibility of the United States' physical evidence. Specifically, it was unclear (1) why all of the AAC waivers had been signed and dated by an IRS agent before they were even sent out to Hammad, and (2) why the IRS sent the taxpayer's copy of Plaintiff's waiver to Hammad instead of to Plaintiff.

[5] The United States also presented testimony from Depa, however, that testimony was not deemed reliable by this Court because of certain mental problems shown by the witness and acknowledged by the United States.

2750 waivers, and (2) in 1993, all five shareholders knew that AAC was experiencing financial difficulties and was delinquent in paying its taxes. (Tr. at 348-51, 360, 374.)

Damond was a biased witness whose testimony was not credible. Damond, like Hammad, was listed as a director and officer of AAC with the Illinois Secretary of State's Office and was therefore an obvious target for an IRS assessment. The IRS did in fact pursue assessments against Damond in 1999 and 2000 and Damond's appeals objecting to the IRS assessment were repeatedly denied. (Pl.'s Reply at Ex. 2.) IRS efforts to assess Damond for the unpaid taxes were called off, however, after Hammad met with the IRS and intervened on Damond's behalf. (Tr. at 375-76.) Hammad's intervention and the IRS's decision to terminate assessment proceedings against Damond show that Damond's testimony for the United States is tainted by the United States dropping claims against Damond prior to his testimony, and that Damond and Hammad were friends. Damond's friendship with Hammad was further revealed at trial when it came out that: (1) in 1991, Damond gave Hammad all of his voting rights in AAC because he trusted Hammad to lead the company, (Tr. at 358); (2) Damond testified against Plaintiff voluntarily and was not subpoenaed, (Tr. at 364); and (3) Damond was making plans to meet Hammad for lunch at the time of the trial. (Tr. at 373.)

Not only was Damond an inherently biased witness, but his testimony was substantially impeached at trial. At trial, Damond testified that Hammad convened an all-AAC shareholders meeting where Form 2750 waivers were discussed and handed out. (Tr. at 349-51.) On cross-examination, however, Damond was impeached with his deposition testimony, which read:

Q.      At some point in time do you recall did you actually sign a waiver?

- 8 -

A. I can't tell you exactly when I signed it or where I was, but I remember that I had no choice and I did sign it.

Q. And did you get this waiver form from Mr. Hammad or directly from the IRS?

A. Well, I never got anything directly from the IRS. So how it got to me, I can't – I can't speak to that, how it got to me, but I know how it didn't get to me. They didn't send me anything.

Q. They being the IRS?

A. That's correct.

(Damond Dep., Sept. 29, 2004, at 17-18.)

Thus, Damond's testimony about an all-AAC shareholders meeting where waivers were discussed and handed out was not credible. In addition to finding Damond's testimony not credible, the Court also found Damond's demeanor at trial to be sketchy, flippant, and otherwise not convincing.

Hammad, the United States' key witness throughout this entire case, was not called to testify at trial and, therefore, never responded to Plaintiff's allegations of forgery.

### b. Person responsible for collecting and paying taxes

The United States argued that Plaintiff had a duty to collect and pay AAC's withheld employment taxes. Under 26 U.S.C.A. § 6672, Plaintiff is responsible for unpaid taxes if he retains sufficient control of corporate finances such that he can allocate corporate funds to pay the corporation's other debts in preference to the corporation's withholding tax obligations. *Thomas v. United States*, 41 F.3d 1109, 1113 (7th Cir. 1994); *Bowlen v. United States*, 956 F.2d 723, 728 (7th Cir. 1992). Plaintiff need not have exclusive control over the disbursal of funds to

be held responsible. Rather, the inquiry focuses on whether Plaintiff could have impeded the flow of business to the extent necessary to prevent the corporation from squandering the taxes it withheld from its employees. *Thomas*, 41 F.3d at 1113. Indicia of control may include check-writing responsibilities and holding corporate office, though neither one is per se evidence of control. *Id.* at 1114.

Despite the fact that official AAC filings with the Illinois Secretary of State listed Hammad and Damond as officers and directors but not Plaintiff, the United States argued that Plaintiff had sufficient control over AAC to be a person responsible for unpaid taxes. To prove that Plaintiff had sufficient control over AAC, the United States presented: (1) minutes and documents showing that Plaintiff served as a vice president of AAC; (2) AAC checks that were co-signed by Plaintiff; (3) testimony suggesting that, on a few occasions, Plaintiff had mailed out checks without any co-signor; and (4) testimony that Plaintiff diverted paint and AAC labor to his wife's business ventures.

The United States presented minutes and documents showing that Plaintiff served as a vice president of AAC and co-signed AAC checks. However, unanimous consent agreements in lieu of annual meetings of shareholders from 1991 to 1993, (Pl.'s Trial Exs. 1-5), as well as testimony from Plaintiff, Gardner, and Pam Moore, the secretary at AAC during the quarters in issue, made clear that official meetings rarely took place at AAC (approximately two formal Board of Directors meetings in the history of AAC) and that, while each shareholder had an official title, the titles meant nothing, as Hammad alone controlled all of AAC's financial dealings. (Tr. at 628, 668-69.) While Plaintiff did co-sign a large percentage of AAC checks, his job when co-signing checks was to make sure that AAC was not being over charged by

contractors. (Tr. at 638.) After Plaintiff co-signed a check, it would go into a metal box in Hammad's office and Hammad alone would determine which creditors would be paid and when to release the checks. (Tr. at 639, 643, 654, 661-62.) Plaintiff was not authorized to sign, issue, or release checks on his own. The United States did find a few checks that were signed and mailed out by Plaintiff alone, but testimony revealed that this only occurred when Hammad was out of the country and had preapproved payment and release of the checks. (Tr. at 100, 640.) Based on the evidence presented at trial, it was unclear whether this occurred more than one time.

The United States relied on Moore, Damond, and Jack Ryan, a former employee of AAC, to establish that Plaintiff exercised control as a vice president at AAC. Moore acknowledged that she did not know the various titles assigned to the shareholders or their official responsibilities, but, as noted above, recalled that Plaintiff had some check-signing responsibilities. Damond claimed that Plaintiff was involved in decision making, board meetings, and paying AAC bills. Ryan claimed that Plaintiff had control over AAC personnel and supplies and that, on at least one occasion, Plaintiff sent him to do work for Plaintiff's wife with AAC's supplies on AAC's time. (Tr. at 585-86.)

As discussed above, Damond's testimony was self-serving, biased, impeached, perhaps acquired in a deal involving Hammad, and inherently incredible. Ryan's testimony, like Damond's, was also self-serving, perhaps acquired in a deal with the IRS, and inherently incredible. First, Ryan admitted that the IRS released several federal tax liens against his property just before trial. (Tr. at 599.) Second, Ryan's credibility was weakened on cross-examination when it became clear that he did not work with Plaintiff from 1993 to 1995, as

he testified on direct-examination, (Tr. at 580), but only overlapped with Plaintiff at AAC for a week or two in October 1995, when Ryan was employed by AAC to do one paint job for about ten or twelve hours. (Tr. at 593-98.) Ryan also admitted on cross-examination that he did not know whether Plaintiff provided him with supplies that were owned by AAC when Plaintiff allegedly sent Ryan to do work for Plaintiff's wife. (Tr. at 597.) The United States did not produce any evidence to support Ryan's allegations. Based on these facts, it appears that Ryan offered exaggerated and incredible testimony in order to reap the benefits of a deal with the IRS.

### c. Willfully failed to collect taxes

Finally, the United States argued that Plaintiff willfully failed to collect or pay over the withheld payroll taxes in issue. Under 26 U.S.C.A. § 6672, Plaintiff may be found willful if he knew that AAC had tax liabilities and failed to ensure that the funds were paid to the United States and not to another creditor. *Thomas*, 41 F.3d at 1114. While Plaintiff admitted that he knew AAC had cash flow problems in 1993, he denied that he ever knew of any tax problems. The United States argued that Plaintiff had knowledge of AAC's tax liabilities because (1) he signed the Form 2750 waiver and (2) he had conversations with Damond and Ryan about AAC's tax problems in 1992 and 1993. (Tr. at 347-48, 582-83.) In fact, Damond claimed that he and Plaintiff discussed AAC's financial problems and tax liabilities constantly every day, (Tr. at 348), and that, from 1991 on, everyone at AAC knew about the company's tax liabilities. (Id.)

Because the jury found that Plaintiff never signed the waiver and was never responsible for withheld taxes, it did not need to reach a verdict as to whether Plaintiff's failure to withhold taxes was willful. As discussed above, however, the physical evidence regarding the waiver was

- 12 -

deficient and did not establish that Plaintiff had knowledge of AAC's tax problems and the testimony provided by Damond and Ryan was biased and inherently incredible.

### 3. Verdict and Judgment

On September 21, 2005, having heard all of the evidence, the jury returned a verdict, in the form of special interrogatories, for Plaintiff on his claim for a tax refund and his counterclaim to reduce the judgment outstanding for unpaid assessments. Specifically, the jury found that Plaintiff (1) did not sign the Form 2750 waiver and (2) was not responsible for collecting and paying over withheld taxes at any time. On September 23, 2005, this Court entered a judgment order in favor of Plaintiff and against the United States in the amount of $6,241 plus statutory additions and interest as provided by law. On September 23, 2005, this Court also ordered that judgment was entered in favor of Plaintiff against the United States of trust fund recovery liabilities for the taxable periods ending September 30, 1991, December 31, 1991, March 31, 1992, December 31, 1992, June 30, 1995, and September 30, 1995.

## II. Discussion

Having won his case at trial, Plaintiff now seeks attorneys' fees from the United States. Under Internal Revenue Code, 26 U.S.C.A. § 7430 ("Section 7430"), the prevailing party in any court proceeding brought by or against the United States in connection with determination, collection, or refund of any tax, interest, or penalty may be awarded a judgment for reasonable attorneys' fees incurred in connection with the proceeding. 26 U.S.C.A. § 7430(a)(2). Section 7430 defines "prevailing party" as any party which (1) substantially prevails with respect to the

- 13 -

amount in controversy or substantially prevails with respect to the most significant issue or set of issues, and (2) meets the time limitations and net worth requirements set out in 28 U.S.C.A. § 2412. 26 U.S.C.A. § 7430(c)(4)(A)(i)-(ii). A party shall not be treated as a "prevailing party," however, if the United States can establish that its position in the proceeding was "substantially justified." 26 U.S.C.A. § 7430(c)(4)(B)(i). Substantial justification means "justified in substance or in the main--that is, justified to a degree that could satisfy a reasonable person." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (internal quotations and citations omitted). In other words it means a reasonable basis both in law and fact. *Id.* It is well settled that a party's position can be substantially justified but incorrect, as long as a reasonable person could think that the position was correct. *Id.* at 566 n.2; *United States v. Hallmark*, 200 F.3d 1076, 1079-80 (7th Cir. 2000). Thus, in order to prevail in the Seventh Circuit, the United States must show that its position was grounded in: (1) a reasonable basis in truth for the facts alleged; (2) a reasonable basis in law for the theory propounded; and (3) a reasonable connection between the facts alleged and the legal theory propounded. *Hallmark*, 200 F.3d at 1081; *Phil Smidt & Son, Inc. v. NLRB*, 810 F.2d 638, 642 (7th Cir. 1987).

In making our determination, the Court focuses on the United States' conduct both in the prelitigation and litigation context. *Hallmark*, 200 F.3d at 1081. Attorneys' fees may be awarded in cases where the United States' prelitigation conduct was not substantially justified even though its litigating position may have been substantially justified. *Marcus v. Shalala*, 17 F.3d 1033, 1036 (7th Cir. 1994). Thus, attorneys' fees may be justified if the United States knew before trial of conflicting evidence on a key issue that it was required to prove but failed to take adequate measures to assess the issue. *Hallmark*, 200 F.3d at 1081; *Marcus*, 17 F.3d at 1036.

- 14 -

The purpose of Section 7430 is to deter abusive IRS conduct and to enable taxpayers to vindicate their rights regardless of their economic circumstances. *Franz v. United States*, No. 91 C 419, 1994 WL 142418, at *3 (N.D. Ill. March 1, 1994) (internal citations omitted).

### A.    No Presumption Under Section 7430

As an initial matter, Plaintiff requests a presumption in his favor. Plaintiff argues that the IRS failed to comply with its applicable published guidance so, pursuant to Section 7430(c)(4)(B)(ii), this Court must presume the United States' position lacked substantial justification. According to Plaintiff, the IRS failed to comply with its applicable published guidance by not mailing him a taxpayer's copy of the Form 2750 waiver and by losing the original waiver (if it ever received the original). Plaintiff does not refer to any specific published guidance but cites to the trial testimony of Rodney Joseph, who discussed IRS standard operating procedures and best practices. At trial, Joseph did not refer to any specific published IRS rules or regulations but acknowledged that IRS agents are supposed to file and retain waivers in relevant case files and contact taxpayers who have filed waivers. (Tr. at 133-35.)

There is no question that IRS filing and record keeping in this case was unacceptable. As a result of its poor filing and record keeping, the IRS lost the original Form 2750 waiver (if it ever received the original), was unable to authenticate the faxed copy of the Form 2750 waiver in its possession before or during the trial, and faced an uphill battle at trial. The IRS's failure to keep good records and follow standard filing procedures, however, does not equate to a violation of published guidance and this Court will not treat it as such. For this reason, the Court finds that Section 7430's presumption against substantial justification does not apply in this case.

**B.      Decision By Jury Does Not End The Inquiry**

The United States claims that its litigation position must have been substantially justified and that Plaintiff cannot be a prevailing party because this case went to trial and because Plaintiff never moved for and was never granted summary judgment or a judgment as a matter of law. According to the United States, a case that lacks substantial justification will not survive a motion to dismiss, motion for summary judgment, or motion for judgment as a matter of law, so any case that goes to trial and is decided by a jury is almost automatically deemed substantially justified. Neither Section 7430 nor Seventh Circuit case law supports the United States' argument.

The plain language of Section 7430 states that a prevailing party may recover fees from the United States. While Section 7430(a)(3) goes on to state that a winning party is not a prevailing party if the United States' conduct was substantially justified, the statute does not state that a trial by jury proves substantial justification. Given the simplicity of this argument, and its tremendous implications if true, the Court is confident that Congress would have included this rule in the statute if that was in fact Congress's intention. Additionally, Section 7430 provides that, when the IRS wins at trial but the taxpayer is found to be liable for an amount less than or equal to what the taxpayer conceded in a qualified offer, the IRS lacked substantial justification in rejecting the settlement and going to trial. 26 U.S.C.A. § 7430(c)(4)(E)(i). Thus, the mere fact that a trial took place does not automatically substantiate the United States' position.

Seventh Circuit case law does not support the United States' theory. In *Wilfong v. United States*, the Seventh Circuit analyzed Section 7430 and found that a trial judge erred when he relied solely on a jury verdict to justify granting attorneys' fees. 991 F.2d 359, 368-69 (7th Cir.

1993). The *Wilfong Court* ultimately held that: (1) a jury's verdict is relevant to, but not determinative of, the merits of the United States' position; and (2) when the resolution of a case hinges on determinations of witness credibility, a court abuses its discretion when it finds that the United States' position was not substantially justified. *Id.* The Seventh Circuit then overturned the trial judge's decision to award fees because it found that the United States' evidence, if credited by the jury, was sufficient to support a verdict in its favor, so there necessarily was a reasonable basis in fact for the United States' position.[6] *Id.* at 369. In reaching its conclusion, the *Wilfong* Court noted that, "there may be exceptions to this rule. For example, if the government were to ground its case on inherently incredible or perjured testimony, our decision today would not shield it from an award of litigation costs." *Id.* at 369 n.13. Thus, when applying Section 7430, *Wilfong* requires this Court to focus on the credibility of the evidence presented at trial and not simply assume that all evidence presented by the United States at trial may be credited by the jury.

*Wilfong* does not permit this Court to assume that the United States has presented credible evidence, nor does it permit this Court to rule against a party simply because it chose to have its case tried by a jury. A party may choose not to file motions for summary judgment or judgment as a matter of law for any number of legitimate reasons. In this case, Plaintiff claims that he chose not to file these motions for both financial and strategic reasons, (Pl.'s Reply at 7), and the Court finds Plaintiff's explanations legitimate and reasonable. In short, the mere fact that

---

[6] Significantly, when *Wilfong* was decided, the party opposing the United States bore the burden of establishing that the United States' litigation position was not substantially justified. That burden is now on the United States. *See* 26 U.S.C.A. § 7430(c)(4)(B)(i).

the United State's case was not thrown out of court does not mean that it was substantially justified. *See Marcus*, 17 F.3d at 1036.

## C.    Analysis Under Statute

As discussed above, the credibility of the United States' evidence is the key issue now before the Court. Under *Wilfong*, the United States lacks substantial justification when it bases its case on inherently incredible or perjured testimony. *Wilfong*, 991 F.2d at 369 n.13; *Franz*, 1994 WL 142418, at *3. Having considered the physical evidence and witness testimony in the case at bar, the Court concludes that, in attempting to prove its case, the United States gave unwarranted credence to obviously biased witnesses both before and during litigation and, in so doing, grounded its case on inherently incredible testimony and unauthenticated documents.

### 1.    Litigation Conduct

The United States' physical evidence was totally insufficient to prove its case. Having lost the original copy of the Form 2750 waiver (if it ever received it), the United States was forced to rely on a faxed copy of the waiver, which it received from Hammad, a party whose position was adverse to Plaintiff's. The copy was of poor quality and could not be used to establish that Plaintiff actually signed the original waiver. Next, the official filings, minutes and documents from AAC showed that Hammad was in control of AAC. While those documents also showed that Plaintiff held the title vice president for some time, the most authentic documents were those signed by Hammad and filed on behalf of AAC with the Illinois Secretary of State. These documents showed that Plaintiff was not an officer of AAC at the key times in

the case, contrary to some of the testimony presented by the United States. Significantly, the United States knew all of this before trial. Finally, for the reasons discussed above, the many checks co-signed by Plaintiff did not show that he had control over AAC finances. Thus, the United States' physical evidence did not establish that Plaintiff signed the Form 2750 waiver nor that Plaintiff was ever responsible for AAC's unpaid taxes.

The United States based its case on witness testimony. The United States relied on Damond and Ryan to establish that Plaintiff received and signed the Form 2750 waiver, and to establish that Plaintiff had control over AAC finances and knowledge of AAC's tax problems. As discussed above, Damond was an inherently incredible witness whose testimony was biased, self-serving, perhaps acquired in a deal with the IRS and Hammad, and impeached at trial. Similarly, Ryan was an inherently incredible witness whose testimony was exaggerated, self-serving, and perhaps acquired in a deal with the IRS.[7] It follows that the United States did not present any credible evidence suggesting that Plaintiff was liable for AAC's tax liabilities, the jury could not find the United States' witnesses credible, and the United States was not substantially justified in its litigation conduct. *See Franz*, 1994 WL 142418, at *3 (analyzing *Wilfong v. United States*, 991 F.2d 359 (7th Cir. 1993), and finding that a witness is inherently incredible when the witness's testimony is acquired in a deal with IRS, will help the witness escape liability, and is revealed as untruthful at trial).

---

[7] By finding that these witnesses' testimony was perhaps acquired in a deal with the IRS, the Court does not imply criminal or unethical conduct on the part of the IRS or its attorneys. The Court has no evidence of that. The absence of criminal or unethical conduct, however, does not preclude finding these witnesses' testimony as shaky as the Court does.

### 2. Prelitigation Conduct

The Court finds that the United States' prelitigation conduct was not substantially justified either. The many flaws in the United States' physical evidence and witness testimony discussed above were known to the United States during discovery and pretrial litigation. Specifically, the United States was well aware of the troubling circumstances surrounding the faxed copy of the Form 2750 waiver, the deficiencies in the faxed copy of the waiver, and the significant biases of Damond and Ryan. Most damaging to the United States' prelitigation conduct, however, was its reliance on Hammad.

Hammad was the key witness in the United States' case throughout the discovery period. In his depositions, Hammad testified that Plaintiff signed the Form 2750 waiver, that Plaintiff's waiver was not forged, that Plaintiff exercised significant control at AAC, and that Plaintiff knew of AAC's tax problems. The United States relied on Hammad's deposition testimony and expected testimony at trial as the foundation for various pieces of evidence admitted into the record, including the faxed copy of the Form 2750 waiver, the IRS's SPIRIT computer entries relating to the waiver, and AAC documents.

Hammad was a biased and inherently incredible witness. First, Hammad had everything to gain by assisting the IRS. Hammad was listed as a director and officer of AAC with the Illinois Secretary of State, controlled all of AAC's finances, and was immediately assessed for the entire amount owed to the IRS. In April 2005, Hammad admitted that he was personally liable for all of AAC's withheld payroll taxes and consented to judgment. As a result of his admission, Hammad's own tax liability in this case would decrease one dollar for every dollar Plaintiff was

forced to pay. Accordingly, Hammad had substantial motives to testify falsely as to Plaintiff's liability.

In addition to financial motives, Hammad had personal motives for testifying falsely as to Plaintiff's liability. In short, Hammad and Plaintiff hate one another. All of the witnesses confirmed that Hammad and Plaintiff constantly fought with one another at AAC and that this inability to work together culminated in Plaintiff leaving AAC in 1995. The only dispute on this point at trial was whether Plaintiff was so fed up and furious with Hammad that he quit or whether Hammad was so fed up and furious with Plaintiff that he fired him. Furthermore, Hammad and Plaintiff have brought other lawsuits against each other. (Pl.'s Reply at Ex. 1.)

Finally, Hammad's deposition testimony was inconsistent with evidence accumulated during pretrial discovery and, at times, internally inconsistent. In a November 2004 letter to IRS attorneys, Plaintiff highlighted discrepancies between Hammad's claims against Plaintiff in the case at bar and Hammad's testimony in other proceedings. Specifically, in the case at bar, Hammad suggested that Plaintiff was responsible for AAC's drywall business and contracts, while Hammad's original protest letters to the IRS allege that Larry Holler was the manager of the drywall division, Larry Holler was responsible for withholding taxes, and Larry Holler did not advise Hammad about the failure to pay those taxes until the shortfall had become very substantial. (Id.) As Plaintiff pointed out to the IRS in November 2004, Hammad's protests make no reference to Plaintiff's alleged involvement in the drywall business or responsibility for withheld taxes. (Id.) Hammad's deposition testimony in this case was also internally inconsistent. Hammad claimed that there was an all-AAC shareholders meeting regarding the waivers and that, after the meeting, he went to each office passing out and collecting the waivers

from the various shareholders. Later, in the same deposition, Hammad said that his secretary, Pam Moore, collected up the waivers from the five shareholders of AAC. While these discrepancies alone do not completely undermine the United States' case, taken together, they represent serious flaws in critical pieces of evidence.

Despite Hammad's inherent bias, the United States continued to rely on Hammad when pressing forward with its case. Ultimately, Hammad was not called at trial, and, therefore, never denied forging documents or retaining complete control over all of AAC's financial matters on the stand, and never faced cross-examination before the jury. The Court does not question the United States' strategic decision not to call Hammad but must conclude that the United States knew before trial that Hammad's testimony would hurt its case. Incredibly, this was the same witness that the United States mainly relied upon to support a case against Plaintiff. In other words, the United States knew, before trial, that its case, based as it was on Hammad, was substantially unjustified.

## III. Conclusion

For the reasons stated above, the Court finds that the United States was not substantially justified in its prelitigation or litigation conduct in this case and that Plaintiff is a prevailing party under Section 7430.

**ENTER ORDER:**

**MARTIN C. ASHMAN**
United States Magistrate Judge

Dated: January 24, 2006.

- 22 -

Copies have been mailed to:

ALAN G. ORLOWSKY, Esq.
PATRICIA I. DEEMER, Esq.
A. G. Orlowsky, Ltd.
630 Dundee Road
Suite 125
Northbrook, IL 60062

CHRISTOPHER M. GOODSNYDER, Esq.
Perl & Goodsnyder, Ltd.
14 North Peoria
Suite 2C
Chicago, IL 60607

Attorneys for David A. Urban

ELIZABETH LAN DAVIS, Esq.
WENDY KISCH, Esq.
Tax Division
United States Department of Justice
Post Office Box 55
Washington, D.C. 20044

Attorneys for United States of America

IGNACIO D. MARAMBA, Esq.
ARIEL WEISSBERG, Esq.
401 South LaSalle Street
Suite 403
Chicago, IL 60605

Attorneys for Samy Hammad